# *Cardinal Health 110, LLC,*

# *Cardinal Health 112, LLC*

# *and*

# *American Associated Pharmacies*

# *Prime Vendor Agreement*

*(Execution Copy)*

Exhibit 1

## PRIME VENDOR AGREEMENT

**This Prime Vendor Agreement (the "Agreement") is made by and between American Associated Pharmacies ("GPO") and Cardinal Health 110, LLC and Cardinal Health 112, LLC ("Cardinal Health"), who hereby agree as follows:**

### 1. *Designation as Primary Supplier*

*(a)* *In General*. During the term of this Agreement, GPO will designate Cardinal Health as the exclusive primary wholesale pharmaceutical supplier (the "**Primary Supplier**") to members of GPO's network of providers of pharmaceuticals. Such members participating under this Agreement are collectively referred to herein as the "**Members**" and individually a "**Member**." A list of the members eligible to participate under this Agreement as of the Effective Date is attached hereto as **Exhibit A**. Additional members of GPO's network may be made parties to this Agreement from time to time subject to their agreement to designate Cardinal Health as their Primary Supplier and subject to the prior approval of GPO and Cardinal Health, which may be withheld by Cardinal Health based solely on a prospective Member's inability to satisfy its obligations hereunder, whether financial, regulatory or otherwise. Cardinal Health recognizes that GPO has certain members that utilize an agreement with ▮▮▮▮▮ As of the Effective Date of this Agreement, less than fifty nine (59) GPO members utilize the Miami ▮▮▮▮ agreement. If the number of GPO members that utilize the ▮▮▮▮▮ agreement exceeds 59 members during the term of this Agreement, GPO shall notify Cardinal Health of the change in writing within ten (10) business days. Notwithstanding any other provision in this Agreement, the parties hereby acknowledge and agree that nothing in this Agreement shall be construed to prevent GPO from providing managed care and other products and services to members of GPO's network of providers; provided, however, that GPO shall not enter into a pharmaceutical wholesale supply arrangement with another full line pharmaceutical wholesaler, excepting ▮▮▮▮▮ Cardinal Health acknowledges GPO may perform consultative services related to distribution alternatives for any GPO member that Cardinal Health refuses to supply under the terms of this Agreement. GPO and Cardinal Health will use commercially reasonable efforts to actively promote the implementation of this Agreement to the GPO's members. Cardinal Health will notify GPO of any member of GPO that elects to designate Cardinal Health as its Primary Supplier and become a Member hereunder. GPO members eligible for the benefits specified in this Agreement shall include all members located anywhere in the United States, except as otherwise specified herein.

*(b)* *Provision of Marketing Assistance*. Cardinal Health hereby agrees that, throughout the term of this Agreement, it shall reasonably assist GPO's marketing of this Agreement to retail pharmacies and will not create any financial disincentives for Cardinal Health personnel that assist in the marketing of this Agreement. To that end, Cardinal Health shall work cooperatively with GPO to develop a mutually agreeable marketing strategy, and Cardinal Health shall review its marketing activities and efforts with GPO no less than once per calendar quarter, or as otherwise mutually agreed upon by the parties.

*(c)* *No Solicitation*. Cardinal Health hereby agrees that, throughout the term of this Agreement, it shall not actively solicit Members to leave GPO or any of its subsidiaries. In the event that Cardinal Health actively solicits a Member to leave GPO or any of its subsidiaries and the Member actually leaves the GPO or any subsidiary, then for each of the four calendar quarters immediately following the date upon which the Member leaves the GPO or any subsidiary, Cardinal Health shall pay to GPO ▮▮▮▮▮▮▮▮▮▮▮ If applicable, Cardinal Health shall make such Solicitation Payments to GPO in the form of a check by the 25th day of the first month following the end of the applicable calendar quarter. Finally, Cardinal Health hereby agrees that, throughout the term of this Agreement, if a Member notifies Cardinal

1

Exhibit 1

Health that it wants to enter into a pharmaceutical supply relationship with Cardinal Health outside of this Agreement, either directly or through a group purchasing organization other than GPO, Cardinal Health shall notify the CEO and V.P. of sales of the GPO in writing, not less than 10 business days, prior to entering into such an arrangement. Notwithstanding the foregoing, the parties hereby acknowledge and agree that Cardinal Health is a wholesale pharmaceutical supplier to other group purchasing organizations and that nothing contained in this Agreement shall, in any way, affect Cardinal Health's relationship with such other group purchasing organizations. Furthermore, the parties hereby acknowledge and agree that if a Member leaves GPO of its own accord and thereafter purchases pharmaceutical products on its own or joins another group purchasing organization, nothing contained in this Agreement shall, in any way: (i) affect Cardinal Health's ability to render services to such Member either directly or through the Member's affiliation with the other group purchasing organization, (ii) be construed as obligating Cardinal Health to pay GPO a Solicitation Payment with respect to any such Member, or (iii) be construed to create any other liability for Cardinal Health with respect to the provision of services to any such Member.

2.    *Sale of Merchandise*

Each Member will purchase from Cardinal Health during the term of this Agreement its Primary Requirements (defined below) of pharmaceuticals ("**Rx Products**") and may, at its option, purchase certain other inventory carried by Cardinal Health ("**Non-Rx Products**" and, together with Rx Products, collectively the "**Merchandise**") for delivery directly to such Member. The term "**Primary Requirements**" means that each Member will purchase ████████████ of its requirements of Rx Products from Cardinal Health and the GPO's warehouse. If a Member purchases Merchandise directly from GPO's warehouse, such purchases will be deemed to be purchases from Cardinal Health for purposes of determining the Member's compliance with its obligation to purchase its Primary Requirements from Cardinal Health. Notwithstanding any other provision in this Agreement, Cardinal Health reserves the absolute right to determine what Merchandise it will carry. If Cardinal Health decides to decline to sell or carry any manufacturer's merchandise, GPO may take necessary actions required to fulfill its or its Members' requirements of merchandise from such manufacturer, and Cardinal Health agrees that, in such an instance, such items will be excluded from the purchase requirements in this Agreement. Cardinal Health will make reasonable efforts to assign a CIN number for each item within GPO's, or its subsidiaries', Plan O Gram program.



*3.*     *Purchase Price*

*4.*     *Payment Terms*



4
Exhibit 1



Exhibit 1



## 5.    *Ordering*

(a)    *In General*.  GPO and the Members will submit all orders, except orders for Schedule II Rx products, for all Merchandise to Cardinal Health via Order Express, API's Scan and Toss, or other mutually agreeable electronic means.  Cardinal Health will provide GPO and each Member with access to Order Express at no additional charge; provided, however, GPO and each Member must supply, at its own expense, all hardware required to access Order Express, as well as all required Internet access and any required interfaces or other network enhancements.  GPO and each Member agree not to use Order Express or any other electronic order entry system for any purpose unrelated to this Agreement.  The right of GPO and the Members to use Order Express will be immediately terminated: (i) upon the expiration or termination of this Agreement for any reason or (ii) in the event Cardinal Health reasonably believes security of its website or its proprietary rights are threatened due to such access.  In the event that electronic order entry is temporarily interrupted for reasons beyond the control of GPO, any Member or Cardinal Health, GPO and the affected Members may place orders manually, and the parties will use reasonable efforts to rectify the problem.  In the event GPO does not have access to Order Express for any reason whatsoever during the term of this Agreement, Cardinal Health will begin promptly to provide GPO with updated Member purchase information via FTP transfer of invoice line item detail in accordance with the parties' historic practices, and any other information reasonably requested by GPO, in an electronic format mutually agreeable to the parties.  Cardinal Health shall implement reasonable changes and adjustments to the reports made available to GPO hereunder within forty five (45) days after receipt of written request from GPO, provided that all of the data elements necessary to implement that requested change are contained in Cardinal Health's then current database.

(b)    *Orders for Controlled Substances*.  If available in the applicable area, GPO and each Member may submit orders for Schedule II controlled substances via Cardinal Health's "Controlled Substance Ordering System" ("CSOS").  In the event that GPO or a Member does not utilize CSOS for any or all pharmacy locations, all orders for Schedule II controlled substances for any such pharmacy location shall be submitted to Cardinal Health on DEA Form 222.  In such an instance, DEA Form 222 may be mailed to the applicable Cardinal Health distribution center or given to the delivery driver.  In such an instance, Schedule II orders will be delivered with the GPO's or the Member's next scheduled delivery following Cardinal Health's receipt of the signed original DEA Form 222.  GPO and each Member acknowledges that if the Member gives the DEA Form 222s to the delivery driver, such forms will not be received by Cardinal Health until such time that the delivery driver physically delivers the

DEA Form 222 to the applicable Cardinal Health distribution center. Notwithstanding the foregoing, no Schedule II orders will be delivered other than in compliance with DEA regulations.

**6.**   *Delivery*

(a)   *In General.* Cardinal Health will deliver the Merchandise F.O.B. freight prepaid to customer destination to GPO and each Member and exercise its good faith efforts to provide an efficient delivery schedule designed to meet the mutual needs of Cardinal Health and GPO or the Member, as applicable, in accordance with Cardinal Health's general delivery schedules established from time to time by the applicable Cardinal Health servicing division (exclusive of holidays, etc.). All deliveries will be accompanied by an invoice, and, except as set forth below, all delivery costs (not including emergency deliveries) will be absorbed by Cardinal Health. Members will be eligible to receive ███████████ ████████████████████████ except Members located outside the contiguous United States or other Members mutually agreed upon by the parties from time to time. The Members will incur a separate delivery charge, not to exceed Cardinal Health's actual cost, for additional deliveries. Delivery schedules and purchase order deadlines may be reviewed and changed from time to time as mutually agreed upon by Cardinal Health and the applicable Member. Cardinal Health will make a reasonable effort to accommodate individual order entry and delivery requirements. Depending on the servicing Cardinal Health division, cutoff times may be later than (but not before) 7:00 p.m., and morning deliveries may be earlier than (but not later than) noon.

(b)   *Fuel Surcharge.* Notwithstanding any other provision in this Agreement, GPO and each Member shall pay a fuel surcharge on a per stop basis, for each delivery made to GPO or the Member by Cardinal Health under this Agreement (the "**Fuel Surcharge**"). Each Fuel Surcharge shall be set forth on the invoice from Cardinal Health, and the amount of a given Fuel Surcharge shall be calculated in accordance with the following table:



The fuel prices set forth in the table above represent the national average retail cost per gallon for regular grade gasoline as published by the U.S. Department of Energy (the "**Average Price Per Gallon**"). The current index may be obtained on the Energy Information Administration's website at the following address:

http://www.eia.doe.gov/oil_gas/petroleum/data_publications/wrgp/mogas_home_page.html



By the last day of each calendar month, Cardinal Health shall determine the Average Price Per Gallon for that month. If, pursuant to the table set forth above, the Average Price Per Gallon requires an adjustment to the Fuel Surcharge, such adjustment shall be applicable as of the first (1st) day of the immediately following calendar month.

(c)     *Emergency Deliveries.*  Cardinal Health will provide a twenty-four (24) hour, seven (7) day per week emergency delivery service. The courier charge for such orders will be F.O.B. prepaid and added to the invoice.  A listing of key management personnel and emergency order procedures will be supplied to each Member.  In the event emergency delivery is necessary due to Cardinal Health's inability to receive and process orders, any and all emergency delivery fees associated with any such delivery will be waived.

7.     ***Generics***

(a)     *In General.*  Each Member will purchase directly from GPO's warehouse or through the Cardinal Health Source generic Rx Product program (the "**GPO Generic Source Program**") ████ ████████████████████████████ of those generic Rx Products that are available through the GPO Generic Source Program contract portfolio, and the parties hereby acknowledge and agree that Cardinal Health shall implement a mutually agreed upon automatic substitution program for all applicable GPO Generic Source Program Merchandise.

(d)     *Top Generics.*



Exhibit 1



(e)    *Generic Substitution Credit.*





Exhibit 1



**8.** *Administrative Fees*







Exhibit 1

*9.*     *Other Services*

(a)     *Basic Services*.  Cardinal Health will provide comprehensive support services to GPO and the Members in accordance with Cardinal Health's customary terms and practices.

(b)     *Cardinal Health Programs*.

<u>In General.</u>   Each Member may elect to participate in certain programs offered by Cardinal Health (the "**Cardinal Health Programs**").  If a Member does so, the Member shall enter into a separate agreement (or agreements) with Cardinal Health that memorializes the terms and conditions of its participation in the applicable Cardinal Health Programs, and the Member shall participate in each such program in accordance with the terms and conditions of the agreement for the applicable program, including, but not limited to, paying the applicable participation or membership fee.





### 10.    *Contract Administration*

Cardinal Health will recognize and administer mutually agreed upon manufacturer contracts between GPO or any Member and any manufacturer (collectively, "**Manufacturer Contracts**") subject to their continued validity in accordance with applicable laws and subject to such credit considerations concerning the applicable manufacturers as Cardinal Health may consider appropriate.  If manufacturers' chargebacks available to GPO or a Member for contract items submitted by Cardinal Health are disallowed, uncollectible, or irreconcilable, then the applicable charge will be billed back to GPO or such Member.  Cardinal Health reserves the right, at any time, to decline to sell or carry any manufacturer's merchandise, based upon credit considerations deemed relevant to Cardinal Health.  GPO and/or the applicable Member will notify Cardinal Health of all Manufacturer Contracts.  In addition, GPO or a Member, as applicable, will notify Cardinal Health of applicable new Manufacturer Contracts entered into after the Effective Date and applicable renewals, replacements or terminations of Manufacturer Contracts not less than forty-five (45) days prior to the effective date of such new Manufacturer Contract, renewal, replacement or termination.  Failure to comply with these notice requirements will entitle Cardinal Health to discontinue the service level provisions of Section 11 hereof until forty-five (45) days after delivery of accurate usage data for the new items.

In order to facilitate Cardinal Health's inventory management requirements, GPO (or each Member) will provide to Cardinal Health, with respect to it and each Member, accurate three (3) month's usage figures (including NDC numbers) on both contract and non-contract items in compatible electronic (disk) format fourteen (14) days prior to participation under this Agreement by that Member.  All purchases under this Agreement by GPO and each Member will be for GPO's or the Member's (as applicable) "own use" as that term is defined in judicial or legislative interpretation, and GPO and each Member will comply with applicable manufacturer pricing criteria and policies.

### 11.    *Service Level*

Cardinal Health will exercise all reasonable efforts to provide GPO and its Members with an aggregate average adjusted monthly service level on Rx Products ███████████████ (i) quarterly, (ii) for each individual Cardinal Health distribution center servicing GPO or any Member, and (iii) in accordance with the standards and procedures specified in **Exhibit D**.  Notwithstanding the foregoing, Cardinal Health and GPO shall assess the performance of each Cardinal Health distribution center on a monthly basis and, as necessary, take steps to remediate any issues. ████████████████

17

Exhibit 1



### 13.    *Member Certification*

GPO shall make available to each Member the Terms and Conditions of Prime Vendor Relationship Among Cardinal Health, American Associated Pharmacies. and Member in the form attached as **Exhibit F-1** (the **"Member Terms and Conditions"**) and use reasonable efforts to assist Cardinal Health in obtaining from each participating Member an executed Member Certification Agreement in the form attached as **Exhibit F-2** certifying that such Member has read, understands and agrees to comply with the terms of the Member Terms and Conditions (each, a **"Member Certification"**) and will forward to Cardinal Health any original Member Certification received by GPO.  Cardinal Health shall forward to GPO copies of all Member Certifications upon execution by the Member.

### 14.    *GPO's Purchases of Merchandise from Cardinal Health for GPO's Warehouse*





### 15.    *Term*

The initial term of this Agreement shall commence as of June 1, 2016 (the "**Effective Date**") and shall continue in effect thereafter through April 30, 2019.  Thereafter, the Agreement will automatically renew for one (1) additional one (1)-year renewal term (i.e., through April 30, 2020) unless either party provides written notice of non-renewal to the other party by April 30, 2018.  Either party may affect an early termination of this Agreement upon the occurrence of a material breach by the other party.  The non-breaching party must give written notice to the breaching party of the occurrence of such breach.  The notice must describe in detail the nature of the breach.  The breaching party will have the opportunity to cure its breach, to the reasonable satisfaction of the non-breaching party, during a sixty (60) calendar day period beginning on the date the breaching party receives the written notice (the "**Cure Period**").  In the alternative, if such breach is of a nature that it cannot be cured in sixty (60) calendar days, the breaching party must commence and diligently prosecute in good faith the cure of such breach within the Cure Period and cure such breach within one hundred twenty (120) calendar days of original notice of breach.  If the breach is not cured by the expiration of the Cure Period, or the breaching party has not begun the cure process if it cannot be cured in sixty (60) calendar days, then the non-breaching party may provide written notice to the breaching party that this Agreement will be terminated in thirty (30) calendar days following the expiration of the Cure Period.  Notwithstanding the foregoing, with respect to payment defaults by GPO (with respect to GPO's warehouse purchases under the Agreement) or a Member, or other credit considerations deemed relevant to Cardinal Health, Cardinal Health may terminate this Agreement immediately as to such Member or as to GPO's warehouse purchases under this Agreement, as applicable.  No termination notice from GPO or a Member to Cardinal Health will be effective until such time as Cardinal Health has received payment for all amounts due from GPO or such terminating Member, as applicable.  No termination notice from Cardinal Health to GPO may be effective until such time as GPO has received payment for all amounts due from Cardinal Health.

### 16.    *Notices*

Any notice or other communication required or desired to be given to a party under this Agreement shall be in writing and shall be deemed given when:  (a) received by such party after being sent by certified mail, return receipt requested and addressed to that party at the address for such party set forth at the end of this Agreement;  (b) received by such party after being sent by Federal Express, Airborne, or any other overnight delivery service for delivery to that party at that address; (c) received by facsimile transmission, as evidenced by electronic confirmation, to that party at its facsimile number set forth at the end of this Agreement; or (d) received via email with confirmed receipt of other party.  Either party may change its address or facsimile number for notices under this Agreement by giving the other party written notice of such change.

### 17.    *Taxes/Compliance with Laws*

(a)    *Taxes*.  GPO and the Members will pay when due any sales, use, excise, gross receipts, or other federal, state, or local taxes or other assessments (other than any tax based solely on the net income of Cardinal Health) and related interest and penalties in connection with or arising out of the transactions contemplated by this Agreement.  If Cardinal Health intends to pay any such amount which GPO or a Member is obligated to pay under this section on behalf of GPO or such Member, Cardinal Health will

give notice to GPO or such Member of its intent prior to such payment, and GPO or such Member, as applicable, will promptly reimburse Cardinal Health in an amount equal to the amount so paid by Cardinal Health.

(b)     *General Legal Compliance.*  GPO, each Member and Cardinal Health shall comply with all federal and state laws, rules and regulations applicable to the storage, distribution, purchase, sale and use of pharmaceutical products.

(c)     *Discounts.*  If and to the extent any discount, credit, rebate or other purchase incentive is paid or applied by Cardinal Health with respect to the Merchandise purchased under this Agreement, such discount, credit, rebate or other purchase incentive shall constitute a "discount or other reduction in price," as such terms are defined under the Medicare/Medicaid Anti-Kickback Statute, on the Merchandise purchased by GPO or any Member under the terms of this Agreement.  Cardinal Health, each Member and GPO agree to use commercially reasonable efforts to comply with any and all requirements imposed on sellers and buyers, respectively, under 42 U.S.C. § 1320a-7b(b)(3)(A) and the "safe harbor" regulations regarding discounts or other reductions in price set forth in 42 C.F.R. § 1001.952(h).  In this regard, GPO or the Members may have an obligation to accurately report, under any state or federal program which provides cost or charge based reimbursement for the products or services covered by this Agreement, or as otherwise requested or required by any governmental agency, the net cost actually paid by GPO and/or each Member.

(d)     *Compliance Agreement.*  Each Member shall execute and abide by the terms set forth in the Compliance Representations and Warranties for Customers attached hereto as **Exhibit H**.  As set forth in the Compliance Representations and Warranties for Customers, each Member hereby acknowledges and agrees that, notwithstanding any other provision in this Agreement, or any provision in any other agreement between Cardinal Health and the Member, Cardinal Health may, in its sole discretion, immediately suspend, terminate, or limit the distribution of controlled substances, listed chemicals, and other products monitored by Cardinal Health to the Member at any time if Cardinal Health believes that the continued distribution of such products to the Member may pose an unreasonable risk of the diversion of such products based on the totality of the circumstances and such other considerations as may be deemed relevant by Cardinal Health.

### 18.     *Custom Inventory.*

If Cardinal Health stocks any inventory under this Agreement at the GPO's or a Member's request that Cardinal Health would not otherwise stock ("**Custom Inventory**"), GPO and each Member hereby agrees that, before substituting other inventory in place of such Custom Inventory, and upon the expiration or earlier termination of this Agreement for any reason, GPO or the Member, as applicable, will purchase the remaining Custom Inventory under the terms of this Agreement until it is depleted.

### 19.     *Own Use.*

All purchases by a Member under this Agreement will be for the Member's "own use" as that term is defined in judicial or legislative interpretation and shall not be sold to anyone other than an end user.  Cardinal Health may terminate this Agreement immediately with respect to a given Member in the event it reasonably determines that the Member is in breach of this paragraph.

### 20.     *Wholesaler Safe Product Practices.*

With regard to the purchases made by GPO from Cardinal Health under this Agreement, GPO hereby acknowledges and agrees that it has adopted Cardinal Health's Wholesaler Safe Product Practices

program (the "**Safe Practices Program**"), and is currently, and shall remain during the term of this Agreement, in full compliance with the Safe Practices Program.



22.     *Warranty Disclaimer and Limitation of Liability.*

THERE ARE NO EXPRESSED OR IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE. NO PARTY TO THIS AGREEMENT, INCLUDING EACH OF THE UNDERSIGNED AND EACH INDIVIDUAL MEMBER, SHALL BE LIABLE TO ANY OTHER PARTY FOR INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES.

23.     *Force Majeure*

Cardinal Health's obligations and GPO's or a Member's obligations under this Agreement will be excused if and to the extent that any delay or failure to perform such obligations is due to fire or other casualty, product or material shortages, strikes or labor disputes, transportation delays, manufacturer out-of-stock or delivery disruptions, acts of God, seasonal supply disruptions, or other causes beyond the reasonable control of the party. During the period of any such delay or failure, GPO or the Member, as applicable, may purchase its Primary Requirements from others, but will recommence purchasing from Cardinal Health upon cessation of such delay or failure.

24.     *Records and Audit*

Cardinal Health will maintain records pertaining to the pharmaceutical products purchased by GPO and the Members under this Agreement as required by applicable FDA requirements. At least once in any twelve (12) month period (or, upon Cardinal Health's consent which shall not be unreasonably withheld, more often), and following thirty (30) day's advance written notice to Cardinal Health, GPO will have the right to appoint one or more of its employees to review those relevant records applicable to its pharmaceutical purchases for the sole purpose of verifying compliance with the pricing terms of this Agreement. Any such review will be limited to twelve (12) months of the historical information as of the date such review begins and will be subject to a confidentiality agreement prepared by Cardinal Health and signed by the GPO and its employee(s) who will have access to the information prior to beginning the review.

25.     *Entire Agreement*

This Agreement and its exhibits constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, proposals, bids/bid responses, and understandings between the parties relative to the subject matter of this Agreement.

████████████████████████████████████████████

**26.   *Miscellaneous***

This Agreement will be governed by Ohio law.  Neither Cardinal Health nor GPO may assign its rights under this Agreement without the written consent of the other; provided, however, that Cardinal Health may delegate its rights and obligations to any entity that is controlled by or under common control of with Cardinal Health, Inc., and GPO may delegate its rights and obligations to any entity that is controlled by or under common control with GPO.  This Agreement will be binding on, inure to the benefit of, and be enforceable by and against the respective successors and assigns of each party to this Agreement.

**27.   *Amendments***

No changes to this Agreement will be made or be binding on any party unless made in writing and signed by each party to this Agreement.

**28.   *Waiver***

The failure of either party to enforce any provision of this Agreement will not be considered a waiver of any future right to enforce such provision.

**29.   *Announcements***

Neither GPO (nor any Member) shall issue any press release or other public announcement, verbally or in writing, referring to Cardinal Health or any entity which is controlled by or under common control with Cardinal Health, Inc. without Cardinal Health's prior written consent and advice of counsel. GPO will provide Cardinal Health's Senior Vice-President, Retail Sales and Marketing, 7000 Cardinal Place, Dublin, Ohio 43017, with a written copy of any such press release or other public announcement no less than seventy-two (72) hours prior to GPO's intent to issue such release or announcement.  GPO is responsible for confirming in writing that Cardinal Health's Senior Vice-President, Retail Sales and Marketing has received any such proposed press release.  Any such press release or other public announcement proposed by GPO will be subject to Cardinal Health's revision and final approval.

Cardinal Health shall not issue any press release or other public announcement, verbally or in writing, referring to GPO or any entity which is controlled by or under common control with GPO without GPO's prior written consent and advice of counsel.  Cardinal Health will provide █████████ ████████████████████████████████████████ with a written copy of any such press release or other public announcement no less than seventy-two (72) hours prior to Cardinal Health's intent to issue such release or announcement.  Cardinal Health is responsible for confirming in writing that GPO's Chief Executive Officer has received any such proposed press release. Any such press release or other public announcement proposed by Cardinal Health will be subject to GPO's revision and final approval.  Nothing contained herein shall limit the right of either party to issue a press release or public announcement if, in the opinion of such party's counsel, such press release or public announcement is required pursuant to state or federal securities laws, rules or regulations, or other applicable laws, in which case the party required to make the press release or public announcement shall use its commercially reasonable efforts to obtain the approval of the other party as to the form, nature and extent

of the press release or public announcement prior to issuing the press release or making the public announcement.

### 30.    *Confidentiality*

Neither party may disclose the terms and conditions of this Agreement to a third party without prior written consent of the other party, except as required by law or as necessary to perform its obligations under this Agreement.  This requirement shall expire twenty four (24) months after any termination of this Agreement.

### 31.    *Relationship of the Parties.*

This Agreement does not create any employment, agency, franchise, joint venture, partnership or other similar legal relationship between the GPO or any Member and Cardinal Health.

American Associated Pharmacies

201 LONNIE CRAWFORD Blvd
SCOTTSBORO, AL 35769

Facsimile: _____

By _____

Title ___ CEO / PRESIDENT ___

Date ___ 5/9/16 ___

Cardinal Health 110, LLC
Cardinal Health 112, LLC
7000 Cardinal Place
Dublin, Ohio 43017
Facsimile: (614) 757-6000

By _____

Title __ VP RETAIL Buying Groups __

Date __ 5/9/2016 __

23

Exhibit 1

**EXHIBIT A**

**List of Members**

**EXHIBIT B**



Exhibit 1



26
Exhibit 1



Exhibit 1



Exhibit 1

-----------------------------------------------------------------------

**Discounts and Rebates**



EXHIBIT C

**Excluded Generic Rx Products**

**EXHIBIT D**

**Service Level Definition**



**Cardinal Health Pharmaceutical Distribution**
**Returned Goods Policy**





Exhibit 1

### Cardinal Health Returned Goods Authorization
### Ongoing Assurance

The undersigned customer ("**Customer**") of Cardinal Health 110, LLC. and/or Cardinal Health 112, LLC (the "**Wholesaler**") hereby agrees that this document is being delivered to confirm Customer's compliance with applicable federal, state, and local laws / guidelines concerning returned goods and shall apply to all returns by Customer to Wholesaler from time to time and shall supersede any inconsistent provisions which may be contained in any credit request, purchase order, or other documents pertaining to the supply relationship between Customer and Wholesaler.

1.      Customer represents, warrants, and guarantees to Wholesaler that: (a) each such return shall be made only to the specific Wholesaler from which the item was originally purchased; (b) each such return shall be accompanied by Wholesaler's credit request form (the "**Return Form**"), which shall specify both Customer's and Wholesaler's name and address, the date of the return, the quantity and description of the product returned, and such other information as may reasonably be requested on Wholesaler's Return Form; (c) Customer shall retain a copy of each Return Form and related credit memo and make such documentation available to the manufacturer and to authorized federal, state, and local law enforcement officers upon request; (d) the credit claimed or accepted by Customer for any such return shall not exceed the original purchase price paid to Wholesaler; and (e) all merchandise returned to Wholesaler has been stored and handled by Customer in accordance with all applicable federal, state, and local laws, manufacturer guidelines when disclosed to customer by the manufacturer or wholesaler, and good trade practices, and such merchandise has not been adulterated or misbranded by customer within the meaning of the Federal Food, Drug, and Cosmetic Act and meets all FDA, state, and other applicable requirements and guidelines.

2.      Customer shall indemnify and defend Wholesaler against and from any expense, claim, liability, or penalty (including reasonable legal fees) arising from any failure of Customer to properly comply with the provisions specified in this document.

_____

Customer Name (Print)  (Include all that apply)

_____

By Authorized Person / Title (Print)

_____        _____

Date                                          Signature of Authorized Person

Exhibit 1



Exhibit 1



**Member Terms and Conditions**

**[Document Attached]**

**EXHIBIT F-2**

**AMERICAN ASSOCIATED PHARMACIES**
**MEMBER CERTIFICATION AGREEMENT**
**FOR   [Insert Legal Name of Member]**

     This American Associated Pharmacies Member Certification Agreement (the "**Certification Agreement**") is made and entered into by and between   **[Insert Legal Name of Member]**   and Cardinal Health 110, LLC and Cardinal Health 112, LLC ("**Cardinal Health**").

**1.**     **Member Certification**

     The undersigned is a Member ("**Member**") of the **American Associated Pharmacies** ("**GPO**") network of providers of pharmaceuticals and has elected to purchase pharmaceuticals from Cardinal Health under the terms of that certain Prime Vendor Agreement by and between GPO and Cardinal Health which was effective as of June 1, 2016 (the "**Prime Vendor Agreement**").

     The Member certifies, through an authorized representative, that the Member has received a copy of the Member Terms and Conditions document, which sets forth the material terms of the Prime Vendor Agreement, and has carefully read and fully understands the Member Terms and Conditions document and the Member's and Cardinal Health's rights and responsibilities under the Prime Vendor Agreement. The Member further certifies that throughout the remainder of the term of the Prime Vendor Agreement, and as part of the consideration for Cardinal Health continuing to sell pharmaceuticals to the Member, the Member agrees to be bound by the terms of the Prime Vendor Agreement.

**2.**     **Capitalized Terms**

     All capitalized terms used in this Certification Agreement not otherwise defined herein shall have the same meaning as is ascribed to them in the Prime Vendor Agreement.

**3.**     **Term**

     This Certification Agreement shall be effective as of                 , 201   , and shall continue in effect thereafter throughout the *shorter* of: (a) the remainder of the term of the relationship between Cardinal Health and GPO under the Prime Vendor Agreement or (b) the remainder of the term of the relationship between GPO and the Member.

**4.**     **Initial Purchase Price**



Exhibit 1



**5.       Licensure & Own Use**

The Member represents and warrants to Cardinal Health that the Member has complied with, and is currently and will be at all times during the term in compliance with, all applicable licensing requirements of all applicable federal, state and local governmental authorities, including without limitation any licensing requirements to purchase, receive, possess, store, use, dispense, and/or distribute or otherwise dispose of pharmaceutical products. Prior to purchasing Rx Products from Cardinal Health hereunder and at all times during the term of this Certification Agreement, the Member will provide Cardinal Health with copies of all such licenses and any renewals, revocations, changes or notices related thereto. All purchases by the Member under the Prime Vendor Agreement will be for the Member's "own use" as that term is defined in judicial or legislative interpretation and shall not be sold to anyone other than an end user. Cardinal Health may terminate this Certification Agreement and Member's participation under the Prime Vendor Agreement immediately in the event it reasonably determines that the Member is in breach of this paragraph.

**6.       Miscellaneous**

No waiver of any right or remedy by Cardinal Health shall constitute a subsequent waiver of the same right or remedy. No changes to this Certification Agreement shall be made or be binding on either party unless made in writing and signed by both parties to this Certification Agreement. The validity and interpretation of this Certification Agreement shall be determined by the laws of the State of Ohio, excluding its conflicts of laws provisions. This Certification Agreement shall not be assigned by either party without the prior written consent of the other party; provided, however, Cardinal Health may assign its rights and obligations hereunder without such consent to any entity which is controlled by or under common control with Cardinal Health, Inc.

**[Insert Legal Name of Member]**_____        **Cardinal Health 110, LLC**
_____        **Cardinal Health 112, LLC**
_____        **7000 Cardinal Place**
Telecopy: _____        **Dublin, Ohio 43017**
                                                        **Telecopy: (614) 757-6000**

By_____        By_____

Title_____        Title_____

Date_____        Date_____

Exhibit 1

**EXHIBIT G**

## Cardinal Health Returned Goods Policy – Warehouse



Exhibit 1

## Cardinal Health Return Goods Authorization
## Ongoing Assurance

The undersigned customer ("**Customer**") of Cardinal Health 110, LLC and/or Cardinal Health 112, LLC (the "**Wholesaler**") hereby agrees that this document is being delivered to confirm Customer's compliance with applicable federal, state, and local laws / guidelines concerning returned goods and shall apply to all returns by Customer to Wholesaler from time to time and shall supersede any inconsistent provisions which may be contained in any credit request, purchase order, or other documents pertaining to the supply relationship between Customer and Wholesaler.

1.      Customer represents, warrants, and guarantees to Wholesaler that: (a) each such return shall be made only to the specific Wholesaler from which the item was originally purchased; (b) each such return shall be accompanied by Wholesaler's credit request form (the "**Return Form**"), which shall specify both Customer's and Wholesaler's name and address, the date of the return, the quantity and description of the product returned, and such other information as may reasonably be requested on Wholesaler's Return Form; (c) Customer shall retain a copy of each Return Form and related credit memo and make such documentation available to the manufacturer and to authorized federal, state, and local law enforcement officers upon request; (d) the credit claimed or accepted by Customer for any such return shall not exceed the original purchase price paid to Wholesaler; and (e) all merchandise returned to Wholesaler has been stored and handled by Customer in accordance with all applicable federal, state, and local laws, manufacturer guidelines when disclosed to customer by the manufacturer or wholesaler, and good trade practices, and such merchandise has not been adulterated or misbranded by customer within the meaning of the Federal Food, Drug, and Cosmetic Act and meets all FDA, state, and other applicable requirements and guidelines.

2.      Customer shall indemnify and defend Wholesaler against and from any expense, claim, liability, or penalty (including reasonable legal fees) arising from any failure of Customer to properly comply with the provisions specified in this document.


_____
Customer Name (Print)  (Include all that apply)


_____
By Authorized Person / Title (Print)


_____    _____
Date                        Signature of Authorized Person

Exhibit 1

**EXHIBIT H**



## Compliance Representations and Warranties for Customers

_____ [Insert full, legal name of Customer] ("**Customer**") represents and warrants that it:

1.   will abide by all applicable laws, rules, regulations, ordinances and guidance of the federal Drug Enforcement Administration ("DEA"), the states into which it dispenses or sells controlled substances and/or listed chemicals, and the states in which it is licensed, including, without limitation, all of the foregoing concerning the purchase, sale, dispensation, and distribution of controlled substances; and

2.   will not dispense or sell controlled substances and/or listed chemicals if it suspects that a prescription or drug order is not issued for a legitimate medical purpose or the actions conducted on the part of the prescriber or Customer and its employees are not performed in the normal course of professional practice.

In addition, Customer warrants that it understands that Cardinal Health is required by DEA regulations to report to the DEA suspicious orders of controlled substances and listed chemicals, and Customer agrees to act in good faith in assisting Cardinal Health to fulfill its obligations.  To that end, Customer agrees that it will be alert for red flags of suspicious orders and listed chemicals, including, but not limited to:

1.   Numerous controlled substance prescriptions written for the same drugs, in the same quantities for the same time period by the same or different prescribers or group of prescribers for the same patient;

2.   Numerous controlled substance prescriptions written for the same person or several persons by the same prescriber or group of prescribers; and

3.   Numerous prescriptions written for the same patient by prescribers located in different states than the patient.

Customer agrees that if any of the above-noted or other red flags exist, it is prudent to contact the prescriber to validate the legitimacy of the prescription and/or to discontinue filling prescriptions from the prescriber, group of prescribers, or customer in question. In addition, the pharmacist should contact the State Board of Pharmacy or local DEA Diversion Field Office (see Appendix N, DEA Pharmacist's Manual, 2010 Edition).

If Customer wishes to provide Cardinal Health with access to its prescription claims transaction and/or dispensing data for Cardinal Health's Suspicious Order Monitoring Program, Customer must sign a:

1.   HIPAA Business Associate Agreement with Cardinal Health in a form acceptable to Cardinal Health; and

2.   Data Transmission Request Form for each third party claims switch utilized by the pharmacy(ies) that authorizes the switch to transmit each pharmacy's prescription claims data to Cardinal Health, and/or a Data Transmission Request Form that authorizes Cardinal Health to receive dispensing data from the pharmacy's(ies') dispensing system software vendor(s).

Customer acknowledges that Cardinal Health may provide a copy of this document to the DEA or any other state or federal regulatory agency or licensing board.

Customer hereby acknowledges and agrees that, notwithstanding any other provision herein, or any provision in any other agreement between Cardinal Health and the Customer, Cardinal Health may, in its sole discretion, immediately suspend, terminate or limit the distribution of controlled substances, listed chemicals, and other products monitored by Cardinal Health to the Customer at any time if Cardinal Health believes that the continued distribution of such products to the Customer may pose an unreasonable risk of the diversion of such products based on the totality of the circumstances and such other considerations as may be deemed relevant by Cardinal Health.

The Customer further acknowledges and agrees that it will not file any claims against Cardinal Health, or any related entity, including legal and equitable claims, regarding any decision by Cardinal Health to suspend, limit or terminate its distribution of controlled substances, listed chemicals, and other products monitored by Cardinal Health to the Customer.

Agreed to by a duly authorized officer, partner, or principal of Customer:

Signature: _____

Full Name (print): _____

Title: _____

Date: _____